IN THE MATTER OF THE APPLICATION OF PRINCETON BANK AND TRUST COMPANY, FOR APPROVAL TO ESTABLISH A BRANCH OFFICE AT THE INTERSECTION OF U. S. ROUTE 206 AND THE MOUNT ROSE-ROCKY HILL ROAD.

THE FIRST NATIONAL BANK OF PRINCETON, APPELLANT, v. CHARLES R. HOWELL, COMMISSIONER OF BANKING AND INSURANCE OF THE STATE OF NEW JERSEY, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 13, 1964—Decided April 8, 1965.

Before Judges GOLDMANN, SULLIVAN and LABRECQUE.

*Mr. Crawford Jamieson* argued the cause for appellant The First National Bank of Princeton (*Messrs. Jamieson, Walsh & McCardell,* attorneys).

*Mr. William H. Osborne, Jr.* argued the cause for respondent Princeton Bank and Trust Company (*Messrs. Pitney, Hardin & Kipp,* attorneys).

*Mr. Avrom J. Gold,* Deputy Attorney General, argued the cause for respondent Commissioner of Banking and Insurance (*Mr. Arthur J. Sills,* Attorney General, attorney; *Mr. Alan B. Handler,* First Assistant Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. The First National Bank of Princeton (First National) appeals from a determination of the Commissioner of Banking and Insurance granting the application of Princeton Bank and Trust Company (Trust Company), a commercial state-chartered bank, to establish a branch bank office in Princeton Township. *R. R.* 4:88–8. The application was opposed by First National, a commercial federal-chartered bank; the Comptroller of the Currency (by his representative, the Chief National Bank Examiner for the Third Federal Reserve District), and The First National Bank of Somerset County, which has a branch in the Belle Mead section of Montgomery Township, Somerset County. Only First National appeals.

## I.

Trust Company began operations as a state bank in 1834 in the Borough of Princeton. Until May 1962 its main office and principal place of business was located at 12–14 Nassau Street in the borough. In 1957 it obtained permission from the Commissioner of Banking and Insurance to open a branch office at the Princeton Shopping Center in Princeton Township. The branch occupies premises originally intended for a store and having a frontage of 32.5 feet and some 2,000 square feet of floor area.

The site of Trust Company's proposed branch is a triangular-shaped plot at the southeast corner of State Highway Route 206 and the Mount Rose-Rocky Hill Road (also known as Cherry Valley Road) in Princeton Township. The latter road divides Princeton Township, in Mercer County, from

Montgomery Township, in Somerset County. The proposed service area of the branch lies 40% in Princeton Township and 60% in Montgomery Township; 30% of the housing is in Princeton Township and 70% in Montgomery.

William R. Cosby, president of Trust Company, testified that he initiated a study of the proposed branch site in March 1962. He personally looked over the area and consulted residents for their views regarding the need for a branch. Also consulted was Edmund D. Cook, a local realtor, who had for sometime past been studying the feasibility of locating branches in the areas surrounding Princeton Borough. Although Cosby said that the study had been initiated in March 1962, Cook testified that he had been authorized to negotiate for the proposed site at the close of 1961 or early in 1962, and that an option agreement for the purchase of the property had been entered into about March. The bank also obtained the services of a consultant, Norman G. Asbury, in May 1962.

At a meeting held April 11, 1962 President Cosby reported to the Trust Company board of directors regarding "recent developments with respect to the bank's main office and branch quarters." The board authorized its executive committee, with the advice of counsel, "to resolve all matters relating to the bank's quarters as expeditiously as possible." Thereafter, at a meeting held May 23, 1962, the executive committee adopted the following resolution:

"RESOLVED, that in accordance with the authority contained in the Banking Act of 1948 (Chapter 67, Laws of 1948) under Section 23 thereof (*R. S.* 17:9A–23), the principal office of this bank be changed, effective as of May 23, 1962, to the premises No. 5, Building C, Princeton Shopping Center, North Harrison Street, Princeton Township, New Jersey, which are presently occupied by a branch office of this bank, and that the President, with the advice of counsel, be empowered to file with the Department of Banking and Insurance a certificate of such change.

FURTHER RESOLVED, that the office located at 12–14 Nassau Street, Princeton Borough, New Jersey, heretofore the principal office, be maintained as a branch office."

A certificate of such change was duly filed with the Department of Banking and Insurance. The foregoing was done pursuant to *N. J. S. A.* 17:9A–23, which reads:

"A bank or savings bank may, without satisfying the requirements of section 22 [*N. J. S. A.* 17:9A–22, "Change of principal or branch office; application; approval"], change the location of its principal office to a location then occupied by a branch office maintained by it. After such a change, the bank or savings bank may maintain a branch office at the location formerly occupied by its principal office, or it may discontinue business at such location. Such bank or savings bank shall file a certificate of such change in the department within one week from the date such change is made. A change in location effected pursuant to this section shall not be subject to the limitations imposed by subsections C or D of section 19 [*N. J. S. A.* 17:9A–19, 'Branch offices; location; capital requirements']."

*N. J. S. A.* 17:9A–19, referred to in the statute just quoted, provides:

"A. Any bank or savings bank may, pursuant to a resolution of its board of directors or board of managers, establish and maintain branch offices, subject to the conditions and limitations of this article.

B. No bank or savings bank shall establish or maintain a branch office which is located outside the municipality in which it maintains its principal office; except that a bank or savings bank may establish and maintain a branch office or offices anywhere in the same county as that in which it maintains its principal office

(1) [relates to acquisition of the office or offices of a banking institution through merger] ; or

(2) [relates to acquisition of the office or offices of a banking institution in liquidation or in contemplation of liquidation] ; or

(3) when each proposed branch will be established in a municipality in which no banking institution has its principal office or a branch office.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*"

Subsections (C) and (D) of section 19 set out the capital requirements for banks and savings banks intending to establish a branch office.

Soon after the purported interchange of the principal and branch offices, Trust Company's executive committee adopted a resolution on June 20, 1962 authorizing the proper officers of the bank to file with the Department of Banking and In-

surance an application for a branch office to be located at the southeast corner of Route 202 and Mount Rose-Rocky Hill Road in Princeton Township. This was done pursuant to *N. J. S. A.* 17:9A–20, which provides:

"Before any branch office shall be established, except those branches established pursuant to paragraph (1) of subsection B of section 19, the bank or savings bank shall file written application in the department for the commissioner's approval thereof. If, after such investigation or hearings, or both, as the commissioner may determine to be advisable, he shall find

(1) that the bank or savings bank has complied with the requirements of section 19,

(2) that the interests of the public will be served to advantage by the establishment of such branch office, and

(3) that conditions in the locality in which the proposed branch office is to be established afford reasonable promise of successful operation,

the commissioner shall, within ninety days after the filing of the application, approve such application."

The Commissioner of Banking and Insurance, on notice, set down the branch application of the Trust Company for formal public hearing. Hearings were held before a deputy commissioner on January 4 and 18, February 1, March 13 and 29, and April 5, 1963. The application for the proposed branch was approved by the Commissioner of Banking and Insurance on November 7, 1963. He found that the trade area projected by Trust Company for the branch was a reasonable one, and an area that it might expect to serve; the future growth in the Princeton area would be to the north and northwest sections of Princeton Township and the southern part of Montgomery Township; Trust Company's population estimates for the trade area were more reasonable than the figures projected by the objector, First National; there was still an ample deposit potential available in the trade area, currently not being deposited in existing banking facilities, and there was no evidence to show that the solvency or present healthy condition of any financial institution located in the general area would be endangered. The Commissioner also found that the proposed branch would permit Trust

Company to offer more convenient services to its present as well as potential depositors in the projected trade area and, in doing so, compete on a reasonable and fair basis for the deposit dollar; further, that the site location was a good one and, in his opinion, would attract depositors not currently doing their banking in the immediate area and who use automobile transportation. He found that the proposed branch would be on a satisfactory earning basis within the next three years; any losses accruing during the first two years, or even the third, would not materially affect Trust Company's financial condition.

The Commissioner therefore concluded, in accordance with *N. J. S. A.* 17:9A–20, quoted above, that Trust Company had complied with the requirements of *N. J. S. A.* 17:9A–19; that the interest of the public would be served to advantage by the establishment of the proposed branch office, and that the conditions in the locality in which the branch office would transact business afforded reasonable promise of successful operation.

The Commissioner rejected the contention of the Chief National Bank Examiner for the Third Federal Reserve District that applicant's change of principal office was a flagrant subterfuge to get around the branch bank restrictions in the Banking Act. He found there was no support for such a characterization.

First National's principal contentions on this appeal are that (1) Trust Company's actions were merely a device to circumvent the branch bank limitations of the Banking Act of 1948, as amended (*N. J. S. A.* 17:9A–1 *et seq.*), and (2) the Commissioner's findings that Trust Company had met the requirements of *N. J. S. A.* 17:9A–20 are not supported by substantial evidence and should be reversed.

## II.

We deal, first, with a subsidiary argument advanced by First National, that *N. J. S. A.* 17:9A–23 does not permit an

interchange of offices located in different municipalities. It asserts that *N. J. S. A.* 17:9A–19 and 23 are *in pari materia*, for the reason that the limitations imposed by subsections (C) and (D) of section 19 are expressly excluded from section 23, so that the two must be read together in order to carry out the legislative intent. From this it concludes, as a "corollary," that the limitations of subsection (B) of section 19 are applicable to any proposed interchange made pursuant to section 23. In other words, First National would have us incorporate into section 23 the added limitation: "provided, however, that the location of the principal office and the branch office are in the same municipality."

The short answer to this argument is that the statutory provisions governing the interchange of principal and branch offices are clear and unambiguous. *N. J. S. A.* 17:9A–23 does not, either explicitly or by implication, prohibit such an interchange where the offices are lawfully established in different municipalities within the same county. The reference in section 23 to the change of location of a bank's principal office to "a location then occupied by a branch office maintained by it" can only mean a branch office lawfully established at a location pursuant to *N. J. S. A.* 17:9A–19. Section 19 specifically states that a bank may establish and maintain a branch office anywhere in the same county (here Mercer County) as that in which it maintains its principal office, provided the proposed branch is in a municipality where no banking institution has a principal or branch office. *N. J. S. A.* 17:9A–19(B)(3). The branch office which Trust Company opened at the Princeton Shopping Center, Princeton Township, in 1957 was established at a time when no banking institution had a principal office or branch office in that municipality.

Section 23 permits an interchange of principal and branch offices without satisfying the requirements of section 22 (*N. J. S. A.* 17:9A–22). This latter section does not refer to interchange of offices. Thus, under section 22 it is specifically provided that a bank has the right to change the location

of its principal office or a branch office to any location "within the same municipality" in which the principal office or branch office is located, on filing an application therefor with the Department of Banking and Insurance and obtaining the Commissioner's approval. The application will be granted if the changed location would be in an area not substantially different from the area theretofore served by such office. On the other hand, if the changed location would be in a substantially different service area, the Commissioner is not to approve the application unless, after such investigation or hearing, or both, as he may require, he shall find that the interest of the public will be served to advantage by such change in location, and that conditions in the proposed new location are such as to afford reasonable promise of successful operation.

A reading of applicable sections of the Banking Act of 1948 dealing with the location of banking offices shows that when the Legislature intended that such offices be located or established within the same municipality, it specifically so provided. Thus, with respect to the change of location of a bank office, section 22, just referred to, speaks of changing the location of the principal office or a branch office "within the same municipality" in which such office is located. And *N. J. S. A.* 17:9A–23.2, dealing with the location of auxiliary offices, provides that such office shall be located "in the same municipality" as that in which the bank maintains the office to which such auxiliary office is an adjunct. By contrast, the Legislature omitted from section 23 any municipal limitation with respect to the interchange of principal and branch office. Had the Legislature intended to impose such a limitation, it could easily have done so. We may not assume that the omission was inadvertent. *Cf. Duke Power Co. v. Patten,* 20 *N. J.* 42, 49 (1955).

Accordingly, we find no merit in First National's contention that section 23 does not permit an interchange of a bank's principal and branch offices when they are located in different municipalities.

## III.

We come, then, to the first of the two main arguments projected by First National, namely, that Trust Company's actions were a subterfuge and a device for circumventing our banking laws, and that there was not a *bona fide* transfer of its principal office to Princeton Township.

Standing in isolation and away from the realities of what actually happened, the interchange of the principal and branch offices which Trust Company sought to effect in May 1962 would appear to be legally unassailable. Its executive committee had authorized that the principal office be changed from Nassau Street in Princeton Borough to the Princeton Shopping Center in Princeton Township, then occupied by its branch office, and that the Nassau Street office thereafter be maintained as a branch office. The necessary certificate of change was filed with the Department of Banking and Insurance on May 28, five days later. (Whether the principal office was actually transferred to the shopping center will shortly be considered.) However, the interchange was but the first step of a plan which would enable Trust Company to apply to the Commissioner of Banking and Insurance for a branch office at the proposed new site in the northeastern section of Princeton Township. That application was authorized to be filed with the Department of Banking and Insurance by action of the executive committee taken within the month, on June 20.

The sequence of events speaks eloquently of Trust Company's purpose. It had Mr. Cook, the local realtor, checking the surrounding area for a possible branch site for some time prior to the actions taken by the executive committee, described above. He negotiated for the proposed site around the first of 1962, and the option agreement for the property was executed in March. President Cosby had also been investigating the possibilities of the area. He reported to the bank's board of directors regarding "recent developments" on April 11, 1962, at which time the board authorized its executive committee to resolve the matter of the bank's new quarters as

quickly as possible. Then came the executive committee's resolution of May 23, 1962, authorizing the change of the principal office from the borough to the shopping center in the township, followed soon after by its resolution authorizing the filing of an application with the Commissioner for approval of the new branch office in the northeastern section of the township.

We need not base our conclusion that what Trust Company did was a device to circumvent the provisions of *N. J. S. A.* 17:9A–19 on this factual sequence alone. President Cosby, in his testimony at the Department hearings, candidly admitted the true purpose of the change. In the course of his cross-examination he said:

"I knew that under New Jersey law we could not establish a second branch in the township without the prior step of moving the principal office into the township."

The question was then put, "Wasn't then the application to change your principal office a device so you could have this branch?" Instead of answering directly, Cosby explained that the change was the result of "our feeling," borne out by a study, that the future population growth would be in the township, and the bank wanted to be in the position to serve the Princeton community better by establishing offices where the growth was going to take place. The following ensued:

"Q. You thought that you would have the right to establish another office in Princeton Township, right? A. That's correct.

Q. So you changed your principal office as a method of getting it, right? A. That's correct."

We thus have a frank admission that the only purpose of the interchange was to establish Trust Company's principal office in the township, at the Princeton Shopping Center, so that it might then apply for a branch at the proposed new site. But was there actually a change of the principal office from Nassau Street in Princeton Borough to the shopping

center in Princeton Township? Although the testimony taken at the hearing clearly posed that question, the Commissioner did not deal with it directly. He made no express finding as to where Trust Company's principal office was actually located after the attempted interchange, other than to note that there was no support for the Chief National Bank Examiner's characterization that the interchange was "a flagrant subterfuge." The record clearly shows that the principal office, in fact, remained where it always had been—on Nassau Street in the borough.

The only action taken by Trust Company in allegedly changing its principal office to the shopping center was to pass the resolution of May 23, 1962, advise the Commissioner of Banking and Insurance and the Federal Reserve, and send its stock record and stock transfer books to the shopping center office. President Cosby so testified. He said that the principal lending and administration officers were located at the Nassau Street office. All of the officers, including the president, assistant to the president, three vice-presidents and the treasurer were located there. The Princeton Shopping Center office, which was relatively small in size, had only one assistant vice-president and an assistant manager. No departments were housed there, and the main business of the bank was conducted at Nassau Street.

The testimony and exhibits show that the total deposits at the shopping center office were only one-eighth of the total deposits at the principal office in the borough. Bookkeeping and the preparation of payrolls were centered at the main office, as were consumer credit operations, and a majority of the loans were made at that place. The trust department was located at the Nassau Street office. The board of directors met there. The 1963 editions of *Princeton Community Directory* and the telephone directory listed Trust Company's main office at 12 Nassau Street, Princeton, and the branch as located at the shopping center in the township. A sign hanging inside the glass entrance door at the Nassau Street office informed the public that this was the main office, and Princeton

Shopping Center the branch. This sign was maintained during the period of the hearings.

President Cosby testified on recross-examination that the bank had never notified its stockholders of any change of principal office. In fact, Nassau Street was the place referred to by the bank in its notice to stockholders of the annual meeting to be held on January 22, 1963, and in the proxy for that meeting. The bank subscription warrant for capital stock, and the subscription form itself, refer to Nassau Street as Trust Company's main office.

There can be no question that Trust Company's principal office was and continued to be located at the Nassau Street address at the time of the purported interchange and when it applied for and was granted permission to conduct a branch office at the Route 206-Mount Rose-Rocky Hill Road site. Indeed, President Cosby, at several points in his testimony, referred to the Nassau Street office as the main office, the chief office.

In its brief and at oral argument Trust Company sought to draw a distinction between "principal office" and "main office." It contends that the principal office need not necessarily be the main office, so that the shopping center office may properly be considered the principal office although the center of operations and the place where the significant business of the bank is conducted is at Nassau Street. It relies upon the fact that the Banking Act of 1948, as amended (specifically *N. J. S. A.* 17:9A–19, 22 and 23), speaks only of "principal office."

█ To interpret the statute as narrowly as the bank would have us would be to defeat the clear purpose of the branch bank provisions of the Banking Act. That purpose is to keep branch banking within reasonable limits—this with the public interest and convenience always in mind, as well as the preservation of financial soundness and healthy competition within the banking community.

The Banking Act was completely revised in 1948. It was based in part on recommendations of the Department of

Banking and Insurance and the Attorney General, provisions of the Model State Banking Act and, of course, our then existing banking laws. Extensive research in the office of the Commissioner and the State Library has developed little in the way of legislative history. The Code contains nothing similar to *N. J. S. A.* 17:9A–23; it provides only that a state bank may apply to the banking commissioner to change its location. *Section 3.212.*

However, some light is thrown upon the meaning of "principal office" by referring to *R. S.* 17:4–16, whose source was *L.* 1921, c. 75, §§ 1 and 2. *R. S.* 17:4–16 provided that

"A trust company * * * which conducts its business by means of a *principal or main* office, and one or more branch offices or agencies, all located in the same county, may, with the approval of the commissioner (a) change the location of its *principal or main* office to the location of a branch office or agency, (b) change the location of a branch office or agency to the.location of its *principal or main* office, (c) change the name or designation of any branch office or agency the location of which may be so changed. All or any of the things herein authorized may be done by any such trust company by a resolution, setting forth the change or changes to be made and the date when they are to go into effect, adopted at a meeting of its board of directors, by the affirmative vote of at least two-thirds of all the members thereof. A copy of the resolution * * * shall be presented to the commissioner, who, if he approves the changes, shall place his written approval on the certificate and file it in his office. Upon such filing the changes set forth in the resolution shall become effective from the date stated therein." (Italics ours)

This section of the *Revised Statutes* did not explicitly provide for an interchange of principal and branch offices of a trust company. It would appear that interchanges were specifically and expressly provided for in the 1948 revision for the first time.

However, it is significant that *R. S.* 17:4–16 speaks of "principal or main office," equating the two designations. These were compressed into the single word "principal" in the Banking Act of 1948. Our study of the statutory background of that act leads us to conclude that "principal office" means "main office"—a construction readily supported by

such obvious references as unabridged dictionaries and law dictionaries.

■ Trust Company argues that First National may not collaterally attack the interchange accomplished by the resolution of May 23, 1962 and the certificate filed with the Commissioner. Further, it alleges that First National should have attacked the move at the time it was made. In the first place, there is no indication that First National knew of the proposed interchange. No public notice was required—only the resolution and the filing of the certificate with the Commissioner. The application for approval of the proposed new branch came, as noted, immediately upon the heels of the interchange. In attacking that application First National inevitably had to question whether the so-called "principal office," alleged to be located at the Princeton Shopping Center in the township, was actually the principal or main office of Trust Company. The reason is clear: if the principal office had not, in fact, been transferred to the shopping center, Trust Company could not apply for a second branch in Princeton Township. First National's attack was not collateral but direct; its contention has been and continues to be that what Trust Company did here was part of a plan devised to circumvent the statutory provisions inhibiting the establishment of two branch banks in the same municipality.

What Trust Company could not do directly, it sought to do indirectly. The Banking Act, and particularly *N. J. S. A.* 17:9A–23, the interchange provision, cannot be used to that end. The testimony given before the deputy commissioner was such as to put the Department of Banking and Insurance on full notice that the *bona fides* of the interchange was challenged, for much of the cross-examination of President Cosby had as its purpose to determine whether the principal office had actually been transferred to the shopping center in the township. Moreover, the Comptroller of the Currency, by the Chief National Bank Examiner for the Third Federal Reserve District, had written the deputy commissioner on July 12, 1962 and characterized the alleged relocation of

Trust Company's main office to the shopping center and the moving of the branch office to the Nassau Street location as a "flagrant subterfuge to get around the branch banking restrictions in the Banking Act."

We therefore conclude that the purported interchange in question did not result in an actual transfer of the principal office from Princeton Borough to Princeton Township, so that Trust Company is not entitled to establish a second branch office in the township.

## IV.

This conclusion makes unnecessary detailed consideration of First National's remaining argument that the Commissioner's findings and determination are not supported by substantial evidence.

The determination of the Commissioner of Banking and Insurance is accordingly reversed.